OPINION
Appellant, Maryann Bianchi, sister of decedent Carl Diana, appeals the order of the Mahoning County Court of Common Pleas, Probate Division, vacating and setting aside appellant's letters of authority and appointment as executrix of the estate of Carl Diana.
On December 25, 1985, Carl Diana executed a Last Will and Testament, leaving his estate to his parents, and in the event that they did not survive him, then to his sister, appellant. The document also named appellant as executrix of the estate.
Diana died on August 10, 1996. Subsequently, on November 19, 1996, appellant offered the will for probate in the Mahoning County Court of Common Pleas, Probate Division. The probate court appointed appellant as executrix of the estate and issued letters of authority.
On May 16, 1997, appellee, Sandra Diana, decedent's surviving spouse, filed an Application to Admit Will of Later Date to Probate, offering a written instrument signed by decedent on June 10, 1995.[1] The document appears to be a typewritten list of estate planning factors upon which has been handwritten specific information relating to decedent's estate. At the end of the document appear the signatures of decedent and three other individuals. See Appendix.
An evidentiary hearing was held before a magistrate on June 17, 1997, at which testimony was taken from the three signators to the document. Thereafter, both appellant and appellee filed briefs on the matter. Appellee argued that the document was a validly executed will which operated to revoke the will executed on December 25, 1985. In the alternative, appellee argued that even if the document was not a valid will it nonetheless evidenced an intent to revoke the prior will. Appellant argued that the document was a list rather than a valid will, and was not a valid revocation of the prior will.
The decision of the magistrate was filed on March 17, 1998. The magistrate found that each of the three witnesses had signed the document at decedent's request, that two of the witnesses, James Hunt and Roger Miralia, had signed it contemporaneously with each other and had testified that decedent referred to the document as his will, and that the other witness, Thomas Campbell, had signed the document later the same day and testified to his opinion that decedent believed the document would carry out his intent. The magistrate then ruled that the statutory requirements for the making of a will had been adhered to in the execution of the document offered by appellee. However, the magistrate noted that insofar as the document failed to make any disposition of property, the document was ineffective as an expression of testamentary intent. In addition, the magistrate ruled that the document, although invalid as a will, was nonetheless effective as a revocation of all prior wills and codicils, including the December 25, 1985 document. Having concluded that the document revoked the previously admitted will, the magistrate vacated the appointment of appellant as executrix and ruled that decedent had died intestate.
On March 30, 1998, appellant filed objections to the magistrate's decision. Specifically, appellant claimed that the testimony at the evidentiary hearing failed to establish that Hunt or Miralia saw decedent affix his signature to the document or heard decedent acknowledge his signature, as required by R.C.2107.03. Appellant also objected to the magistrate's determination that the offered document had revoked the prior will, arguing that it did not meet any of the means provided for in R.C. 2107.33 for revoking wills.
On April 22, 1998, the probate court adopted the magistrate's decision as its own overruling appellant's objections and stating as follows:
 "The Court finds and agrees that the document of June 10, 1995 is sufficient to revoke all prior Wills and Codicils as provided by Ohio Revised Code Section 2107.33 (A) as the same constitutes `* * * some other writing that is signed, attested and subscribed in the manner provided by those sections.' (Citations to Sections 2107.01 to 2107.62 of the Revised Code omitted.)"
Thereafter, appellee was appointed administratrix of the estate and issued with letters of authority. Appellant filed a timely notice of appeal on May 14, 1998.
Appellant's sole assignment of error states:
 "The Probate Court erred as a matter of law in concluding that the document of June 10, 1995 was sufficient to revoke the will of December 1985 as provided by Ohio Revised Code 2107.33 (A)."
Appellant's first argument under this assignment is that the June 10, 1995 document failed to meet the requirements of R.C.2107.03. According to appellant, R.C. 2107.03 requires that at least two competent witnesses see a testator subscribe or acknowledge his or her signature. Appellant contends that the testimony offered at the evidentiary hearing failed to establish chat either Hunt or Miralia saw the decedent subscribe his signature or heard the decedent acknowledge his signature on the document.
Appellant's second argument is that the June 10, 1995 document did not meet the requirements of R.C. 2107.33 and therefore could not have operated to revoke the prior will. Appellant reiterates his previous argument that neither Hunt nor Miralia saw the decedent sign the document or heard him acknowledge his signature. Appellant claims that although the June 10, 1995 document purports to declare that prior wills and codicils are null and void, the attempt to do so was ineffective by its failure to meet the requirements of R.C. 2107.33 (A). As such, appellant claims the prior will was not effectively revoked.
R.C. 2107.03 states:
 "Except oral wills, every last will and Testament shall be in writing, but may be handwritten or typewritten. Such will shall be signed at the end by the party making it, or by some other person in such party's presence and at his express direction, and be attested and subscribed in the presence of such party, by two or more competent witnesses, who saw the testator subscribe, or heard him acknowledge his signature."
In addition, R.C. 2107.33 (A) provides:
 "A will shall be revoked by the testator by tearing, canceling, obliterating, or destroying it with the intention of revoking it, or by some person in the testator's presence, or by the testator's express written direction, or by some other written will or codicil, executed as prescribed by sections 2107.01
to 2107.62 of the Revised Code, or by some other writing that is signed, attested, and subscribed in the manner provided by those sections."
Appellant argues that the evidence failed to establish that at least two witnesses had either seen Diana sign the document or heard Diana acknowledge that his signature was on the document. The first witness offered by appellee at the evidentiary hearing was Diana's former handyman, James Hunt. Hunt testified that he had signed the document in the Florida room of Diana's former residence at Diana's request. On direct examination, the testimony of Hunt was as follows:
 "Q. Now, Carl asked you to witness this as his will? Is that your statement?
"A. Yes.
"Q. Okay. Was his signature on there?
"A. Yes.
 "Q. Did he indicate — did he say," I signed this. I want you to witness this, or would you tell the Court what he said?
 "A. He said he was making his will out and he wanted me to witness it, and that was it. I said," Okay. There's no problem.' I didn't read it, because I didn't want to know the contents of it.
"Q. You didn't read it?
"A. No." (Tr. 11)
On cross-examination there was some confusion as to whether Hunt had actually witnessed Diana's signature:
 "Q. Now, as I understand it from your testimony, you were asked to witness this document and you signed your name on June 10 of 1995; correct?
"A. Yes.
 "Q. Okay. Mr. Diana had already signed it; is that right?
 "A. As far as I know, yeah. Because I didn't even look. I seen him writing something. I seen Roger writing something. I wrote mine and left.
 "Q. You don't know when you witnessed it whether he signed this document?" He being Mr. Diana; is that true?
"A. He signed it. I seen him sign it.
"Q. Do you —
 "A. But I don't know if it was at the same time or not.
However, Hunt then testified as follows:
 "Q. You saw him sign the document. Do you know what he signed on the document?
"A. Signed his name at the bottom.
"Q. And that was done in your presence?
"A. Yeah." (Tr. 15-16)
Hunt also testified that Diana had previously told him he was going to get a will made out.
The next witness was a former employee of Diana's, Roger Miralia. Niralia's testimony was as follows:
 "Q. Okay. Can you indicate to the Court how it was, sir, that your name appears or your — did you place your name there? Did you sign it?
"A. Yes, sir.
"Q. How did that take place?
 "A. Well, I was over Mr. Diana's house one day. I needed some parts or cleaning supplies for the apartment building, and he asked me to look at this paper. And he said basically it was a paper that left everything to his wife Sandy in case anything happened to him and he wanted me to sign it, basically. And Jimmy was there also, and he signed it. We both signed it, and that was it.
"Q. Did Carl sign it?
"A. Yes.
"Q. Did you see Carl sign it?
"A. Yeah.
"Q. And you signed it?
"A. Yeah.
 "Q. And he told you this is — what did he say?
 "A. He basically says it's a will basically to leave everything to Sandy in case anything happened to him. He had been having problems with his heart previously, so I guess he wanted us to witness it." (Tr. 20-21)
Cross-examination of Miralia proceeded as follows:
 "Q. Mr. Miralia, had Carl already signed that document when he talked to you about it?
 "A. I don't really remember if I saw — I saw I think I saw the signature was on there, but I'm not positive that it was he signed it before or signed it after. He just called us in and I looked at it.
"Q. And did you read through it?
 "A. I looked over it, basically. I just glanced through it, basically, and I could see it looked like a form of a will that left something to somebody.
"Q. You're not a lawyer by profession?
"A. (Shakes head)
"Q. You have to answer that out loud.
"A. No, I'm not an attorney.
"Q. Did you see Mr. Hunt sign it?
"A. Yes, sir.
 "Q. Okay. Did you see Mr. Campbell sign it?
"A. No." (Tr. 22-23)
Both Hunt and Miralia confirmed that the third witness, Thomas Campbell, had not been present at the time they affixed their signatures to the document. Campbell testified as follows:
 "Q. And how did your name get on that document?
 "A. Carl asked me to read it and then sign it and date it.
"Q. That is you signature there?
"A. Yes, it is.
 "Q. Would you tell me — it's dated what date?
"A. June 10, 1995.
 "Q. When you signed that document, were the other signatures already on it?
"A. Yes, they were.
"Q. Carl's also.
"A. Yes, it was.
 "Q. Did he make any indication to you that he had signed that?
"A. Yes, he did.
 "Q. Tell me about — he wanted to you [sic.] read this?
"A. Right.
"Q. Did you read it?
"A. Yes, I did.
"Q. Completely?
"A. Yes, I did.
"Q. What did Carl indicate to you?
 "A. He indicated that this is his intent to file this with his attorney and have it made into a proper document.
"Q. Okay.
"A. Right.
"Q. And what else did he indicate to you?
"A. You mean as far as this was concerned?
"Q. Uh, huh.
 "A. Well, he indicated that — that his wife was his primary heir, that his step children and niece and nephew were contingent, based upon their death in a common disaster.
"Q. Okay.
"A. Okay. And that was —
"Q. He asked you to sign it, though?
"A. Yes.
"Q. Why was that? Did he tell you why?
 "A. No. But I think the reason he wanted me to sign it was the fact that he wasn't feeling very well at the time, and that he was a lot sicker than what he indicated, and that the probability was that in the event of his premature death prior to his getting into town to meet with his attorney that this would be considered a legal document. That was his opinion.
 "Q. Okay. He told you that, as well as — was that his handwriting to your knowledge?
"A. The best of my knowledge, it is.
"Q. I mean on the sheets itself?
"A. Yes." (Tr. 26-28)
On cross-examination, Campbell testified that none of the other signatures on the document had been affixed in his presence. On redirect examination, the following exchange occurred:
 "Q. Did Carl acknowledge his signature, that he signed it?
"A. Yes, he did.
 "MR. McNALLY: Objection to the term `acknowledge.' It's calling for a legal conclusion.
"A. He — he.
 "THE COURT: Hold on, one moment, sir. As to using the word acknowledge?
 "MR. McNALLY: Acknowledge. That's all the objection goes to.
 "THE COURT: Why don't you rephrase the question. I'm going to sustain the objection. Put it in more layman's terms.
 "MR. MARSHALL: What, if anything, did Carl tell you about his signature on that document?
"A. Well, he asked me —
 "MR. McNALLY: I object. I have no problem with the question if it simply says, "Did Carl say this was his signature?'
 ""THE WITNESS: He asked me to witness his signature.
 "THE COURT: I think the question is, and I'm going to let Mr. Marshall go back into this field if he wishes to, but I think what the Court is interested in finding out, at least at this stage, is did — I don't want to use the word `acknowledge,' but did he indicate to you that that was, in fact, his signature?
"THE WITNESS: Yes." (Tr. 31-32)
R.C. 2107.33 provides the exclusive methods by which a will may be revoked. In re Estate of Mantalis (1996), 109 Ohio App.3d 61,64. The terms `attest' and `subscribe' refer to two separate acts in the process of execution. Subscription is the physical act whereby a witness affixes his or her signature on a will for purposes of identification. See In re Estate of Wachsmann (1988),55 Ohio App.3d 265, 267 n. 2. Attestation is the mental process by which the subscribing witnesses hear the testator acknowledge his signature or see him sign the instrument in their presence.Bloechle v. Davis (1937), 132 Ohio St. 415, 419. A witness need not know the contents of the document, Raudebaugh v. Shelley
(1856), 6 Ohio St. 307, 315, or even that it is a will. In reWill of Maurer (1933), 31 Ohio N.P.(N.S.) 247, 249. If the witnesses see the testator sign the document, an acknowledgment is not necessary, but if the will was signed out of the presence of the witnesses, the witnesses must hear the testator acknowledge his signature. See Underwood v. Rutan (1920),101 Ohio St. 306, 311. Furthermore, an acknowledgement does not require the use of any specific language. Raudebaugh, supra.
Although the witnesses must sign in the presence of the testator, it is not essential that the witnesses attest the instrument at the same time or in the presence of each other. See McFadden v.Thomas (1951), 154 Ohio St. 405, 411.
The first witness, James Hunt, testified that he saw Diana sign the document in his presence prior to affixing his own signature on the document. The next witness, Roger Miralia, also testified to witnessing Diana sign the document in his presence, but, on cross-examination, could not recall whether Diana had signed the document prior to showing it to Miralia or whether Diana signed it in Miralia's presence. The final witness, Thomas Campbell, testified that Diana acknowledged to him that he had previously signed the document prior to requesting that Campbell sign it.
Although it is questionable as to whether the document was properly attested to by Miralia, the evidence nonetheless establishes that both Hunt and Campbell attested and subscribed the document in the manner prescribed by R.C. 2107.07. Therefore, the trial court correctly found that the document had been properly attested and subscribed under the Revised Code.
In addition, the probate court correctly held that the document failed to make any disposition of decedent's property and thus was not effective as a will. "To the validity of every disposition, as well of personal as of real estate, it is requisite that there be a definite subject and object; and uncertainty on either of these particulars is fatal." Cope v.Cope (1887), 45 Ohio St. 464, 469-70. Therefore, the issue remaining is whether the document, although ineffective as a will, was nonetheless sufficient to revoke the December 25, 1985 will.
Revocation is an act of the mind, which must be demonstrated by some outward and visible sign or symbol of revocation. Kent v.Mchaffe (1859), 10 Ohio St. 204, 213. The intent may be inferred from the nature of the act, or it may be shown by extrinsic evidence, but it must be demonstrated in some way. 31 Ohio Jurisprudence 3d (1997) 345, Decedent's Estates, Section 359. However, intention alone is not sufficient in law to revoke a will, but such intention must be carried into effect, and by such executed act or acts as to clearly establish the concurrence of both intent and act. Lesnett v. Hunter (1921), 15 Ohio App. 388,390.
The revocation of a will by a non-testamentary writing is not a subject that has received much attention from the courts in Ohio. However, cases decided by our sister jurisdictions are instructive on the issue of whether a testator has demonstrated the necessary intent. For example, in Hessmer v. Edenborn (1940),196 La. 575, 199 So. 647, it was held. that where a will was deposited in a safety deposit box, the words "[t]he Will and Testament above referred to I hereby declare void" written upon the deposit box receipt was sufficient to revoke the will in question. So too, in In re Holt's Estate (1961), 405 Pa. 244,174 A.2d 874, the words "I hereby render this will void and intend to make one revised," written across the bottom of a will was effective to revoke the will. In In re Kehr's Estate (1953),373 Pa. 473, 95 A.2d 647, the court stated: "The words `Null and Void' are clear; and undoubtedly amount to a declaration of revocation."
As already noted, the document itself appears to be a list of various factors to be considered in crafting a will. It resembles a worksheet that a lawyer might use in preparing a will for a client. One of the items on the document states:
"XI. documents
"A. existing estate planning documents
 "1. prior wills and codicils [null and void]
 "2. contracts to make a will [None]"
(Underlined material handwritten on original. See Appendix.)
Miralia testified that Diana had told him that the document was a paper that left everything to his wife in case anything happened to him. Campbell testified that Diana indicated to him that he intended to file it with his attorney to have it made into a proper document, and that Diana was of the opinion that it would be considered a legal document in the event that he should die before meeting with his attorney. The testimony of Campbell indicates that decedent believed the document would carry out his intentions upon execution.
We believe that decedent's markings on the document indicate a present intent to revoke all of his prior wills and codicils. Although the document is in a sense incomplete in that decedent had not yet had the document turned into a valid will by his attorney, the fact that decedent went to the trouble of having the document executed indicates a present declaration of revocation rather than some future intent to revoke. The phrase" null and void is clear and unambiguous. Accordingly, we find no error on the part of the trial court in ruling that the writing was sufficient to revoke all prior wills and codicils, including the will formerly offered by appellant.
Appellant's sole assignment of error is without merit.
The decision of the probate court is hereby affirmed.
Vukovich, J., and Waite, J., concurs
[1] Decedent and appellee were married sometime after December 25, 1985.